**Robert S. GARRICK, Plaintiff,**

v.

**Lloyd John KELLY, Jr., Defendant.**

**Civ. A. No. 86–0217–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 5, 1986.

Albert J. Ahern, Jr., Bailey's Crossroads, Va., for plaintiff.

Jeffrey Judd Vitt, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

This matter came before the Court on plaintiff's motions: (1) for judgment notwithstanding the verdict on the malicious prosecution count of defendant's counterclaim, pursuant to Rule 50(b), Federal Rules of Civil Procedure; (2) for a new trial, pursuant to Rule .59(a), Federal Rules of Civil Procedure; and (3) for a remittitur. After considering the parties' briefs and arguments, the Court DENIES the plaintiff's motions for the reasons stated below.

## FACTS

This case presents a factual scenario that would have inspired Dickens to write his finest novel. The tale begins with a failing marriage. It was the worst of times for the plaintiff Robert Garrick, a Georgetown lawyer: his wife Laurie had left the marital home in the spring of 1985 to contemplate the future of their lives together. He was upset, but they nonetheless remained on amicable terms. They saw each other frequently; she kept him informed of each change of her address; and she eventually rented a house near his. That summer, however, Laurie met the defendant Lloyd John Kelly, Jr., a Middleburg, Virginia equine artist and sculptor.[1] The two began dating.

When Garrick discovered the relationship, he hired a private investigator to spy on his wife and Kelly. Although he still professed love for his estranged wife, he believed that as her husband he should keep tabs on her. The detective uncovered,

Garrick claimed, "dramatic evidence" of his wife's adultery.

Knowing that his wife's lease on her rented Georgetown house was about to expire and that he was planning to serve divorce papers upon her, on October 6, 1985 Garrick drove to her house purportedly to inquire about her new address. He saw Laurie and Kelly loading her possessions into her car and Kelly's car. Parked across the street, Garrick stealthily surveilled his wife and Kelly for several hours. Finally, the two got into their cars to drive away. "With affection beaming in one eye and calculation shining out of the other,"[2] Garrick pursued, artfully dodging their notice—all the way to Middleburg.

Kelly and Laurie unloaded her possessions at the artist's studio under Garrick's furtive observation. His presence, however, was eventually detected by Laurie.[3] After several hours of spying in Middleburg, Garrick approached Kelly from behind as the artist was crossing the street to the police station to alert the police to Garrick's behavior. Garrick spewed sharp words at Kelly, accusing him of committing adultery with his wife. He then threw a roundhouse punch at the physically smaller Kelly, but Kelly, a black belt in judo, proved "rather a tough customer in argyment,"[4] and Garrick "ate 'umble pie with an appetite."[5]

After interviews at the police station and treatment at the local emergency room, both men went to the Magistrate of the General District Court of Loudoun County, Virginia to swear out warrants against each other for assault and battery.[6]

Kevin O'Connell was the Assistant Commonwealth's Attorney who handled both the criminal case against Kelly and that against Garrick. O'Connell never inter-

---

1. A law firm colleague of Garrick's introduced Laurie to Kelly at a dinner party in Middleburg.

2. Charles Dickens, *Martin Chuzzlewit,* ch. 8 (1843–44).

3. At this point, Kelly had never met Garrick and would not have recognized him.

4. Charles Dickens, *Barnaby Rudge,* ch. 1 (1841).

5. Charles Dickens, *David Copperfield,* ch. 39 (1849–50).

6. However, Garrick originally demanded that the Magistrate issue a warrant charging attempted murder. The Magistrate refused.

viewed Kelly, but he did meet with Garrick and his attorney who gave him Garrick's version of the incident.

To play peacemaker between these two men, O'Connell made what he undoubtedly thought was a pickwickian offer to Kelly's attorney to recommend that the charge against Kelly be deferred for six months and then dismissed, absent any violations of the law, if Kelly would plead guilty. At that point, O'Connell had the same disposition in mind for Garrick's case.

Kelly testified at trial that he authorized his attorney Walter Jacob to accept the arrangement offered by O'Connell if and only if: (1) he would be permitted to assert his innocence; (2) the charges against Garrick would be resolved similarly or, if Garrick refused O'Connell's offer, by trial on the merits; and, (3) the disposition would not entail a conviction. Jacob testified that, when he appeared in General District Court on December 6, 1985 on Kelly's case, he had authority to tender a guilty plea on Kelly's behalf. Kelly did not appear in court.

While O'Connell informed the Court of his recommended disposition, the Court declined to require the tendering of a guilty plea and instead simply continued the case for six months, until June 5, 1986, at which time it was to be dismissed absent subsequent violations of the law. Because Kelly's case was not proceeding to trial, O'Connell decided to enter a nolle prosequi in Garrick's case.

O'Connell later learned that Garrick had no interest in peace but instead had written a virulent letter decrying Kelly as a "criminal," based upon the October 6th incident and the disposition of the criminal case. Without waiting for the six-month deferral period to expire, O'Connell then unconditionally dismissed the charges against Kelly, entering a nolle prosequi on March 6, 1986, and joined with Kelly in seeking an expungement of those charges on the ground that "the continued existence and possible dissemination of information relat-

ing to the arrest of [Kelly] may cause circumstances which constitute a manifest injustice to [him]." Kelly's record was thereafter expunged.

On February 27, 1986, Garrick instituted this diversity lawsuit against Kelly in federal court, alleging assault and battery and malicious prosecution. Kelly countersued for assault and battery and malicious prosecution.[7] After a two-day trial, the jury found in favor of Kelly on all counts and awarded him $20,000 as compensatory damages on his assault and battery claim, and $5,000 as compensatory damages and $50,000 as punitive damages on his malicious prosecution claim.

## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

To recover on a claim of malicious prosecution under Virginia law, a plaintiff must establish four elements:

that (1) the prosecution was instituted by or with the cooperation of the defendant; (2) the prosecution was terminated in a manner not unfavorable to the plaintiff; (3) the prosecution was instituted without probable cause; and (4) the defendant acted with malice.

*Lee v. Southland Corp.*, 219 Va. 23, 244 S.E.2d 756, 758 (1978); *Cramer v. Crutchfield*, 496 F.Supp. 949, 953 (E.D.Va.1980), *aff'd*, 648 F.2d 943 (4th Cir.1981). In his Rule 50(b) motion for judgment notwithstanding the verdict, Garrick protests that the criminal case against Kelly did not terminate in Kelly's favor but rather was dismissed pursuant to a compromise reached by Kelly's lawyer and the Commonwealth's Attorney. He also argues that the evidence adduced at trial established as a matter of law that he had probable cause to institute the assault and battery prosecution against Kelly.

In some circumstances, courts have ruled that "a voluntary compromise of a criminal prosecution, by the procurement or with

---

**7.** Kelly's counterclaim also alleged causes of action for libel, abuse of process, negligence and respondeat superior negligence. However, these claims were nonsuited before trial.

the consent of the accused, in itself defeats a recovery in a subsequent action for malicious prosecution based upon the criminal proceeding." *Orndorff v. Bond,* 185 Va. 497, 39 S.E.2d 352, 354 (1946). Where the dismissal is not shown to have been the result of a valid compromise or settlement, however, no bar to recovery applies. *Robertson v. Bell,* 57 Wash.2d 505, 358 P.2d 149, 153 (1961). And where the evidence on that point conflicts, the jury and not the Court must decide it.[8] *See, e.g., Chatman v. Pizitz, Inc.,* 429 So.2d 969, 972 (Ala.1983) ("[W]here the parties join issue by way of pleadings and proof with respect to the defense of compromise, that issue is to be rendered by the jury like any other triable issue of fact."); *Survis v. A.Y. McDonald Manufacturing Co.,* 224 Minn. 479, 28 N.W.2d 720, 727 (1947) (Where there was "no conclusive evidence that plaintiff's attorney induced or caused the dismissal ... the trial court could do no more than submit this issue to the jury."). *Accord, Ferrell v. Livingston,* 344 Ill.App. 488, 101 N.E.2d 599 (1951); *Jennings v. Clearwater Manufacturing Co.,* 171 S.C. 498, 172 S.E. 870 (1934). In short, the defense of compromise is for the jury unless it is uncontested as a factual matter. *Cf. Tucker v. Duncan,* 499 F.2d 963 (4th Cir.1974) (The record indicated "without contradiction" that the underlying charges had been dismissed by way of nolle prosequi procured by the plaintiff's lawyer.); *Orndorff v. Bond, supra* (The evidence was "without contradiction" and "conclusively disclose[d]" that the plaintiff voluntarily compromised and settled" the misdemeanor warrant.).

Because of conflicts in the evidence concerning the termination of the criminal case against Kelly, the Court submitted the issue to the jury.

The question to be resolved in deciding a motion for judgment notwithstanding the verdict is whether there is evidence upon which a jury can properly find a verdict. *Ralston Purina Co. v. Edmunds,* 241 F.2d 164, 167 (4th Cir.1957). The principles governing decision of the motion have been stated as follows:

> In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

*Whalen v. Roanoke County Board of Supervisors,* 769 F.2d 221, 224 (4th Cir.1985) (quoting 9 Wright & Miller, *Federal Practice and Procedure* § 2524 at 543–45 (1971)).

■ The jury's determination that Kelly won a not unfavorable disposition is not contrary to the weight of the evidence. On at least four grounds, the evidence entitled the jury to find that Kelly's criminal case was *not* terminated under a valid compromise with his consent.

First, the jury could reasonably have concluded that O'Connell abandoned the charges against Kelly because he came to doubt Garrick's version of the events and because he wanted to put Kelly on an equal footing with Garrick, whose case had been nol prossed.

Second, the jury was entitled to find that, even if O'Connell and Kelly's lawyer had agreed upon a disposition, the District Court rejected that arrangement sua sponte, declining to accept a guilty plea and deferring the case as it saw fit, rather than on the basis of any compromise procured by Kelly.

Third, even if the District Court's deferral of adjudication for six months was a compromise Kelly ratified, the ultimate dismissal of the case was not pursuant to that order but to a subsequent order. That subsequent order was entered at O'Connell's behest, before the deferral period had expired, based on his determination that the case did not merit prosecution.

---

**8.** While the Virginia courts have not had occasion to address this issue specifically, the Court assumes that if faced with the issue they would follow the weight of authority.

Fourth, even if the final disposition of the case was a compromise that evolved from Kelly's conditional willingness to tender a guilty plea, the jury could have reasonably determined that Kelly did not authorize or ratify the ultimate compromise because an essential condition had not been fulfilled. Kelly's amenability to compromise had been conditioned on Garrick's accepting the same compromise or being forced to trial on the charges proffered by Kelly. However, O'Connell nol prossed Garrick's case without notice to Kelly and contrary to assurances that the condition Kelly reserved would be fulfilled.

The Court is not persuaded by Garrick's attempt to analogize the circumstances surrounding the termination of Kelly's case to statutorily authorized "adjournments in contemplation of dismissal," foreclosing a finding of favorable termination as a matter of law. *See, e.g., Singleton v. City of New York,* 632 F.2d 185 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). *See also Land v. Hill,* 644 P.2d 43 (Colo.Ct.App.1981). The New York procedure, pursuant to N.Y.Crim. Proc.Law § 170.55 (1977), leaves open the question of the accused's guilt. *Singleton,* 632 F.2d at 193. The prosecution terminates as a § 170.55 dismissal. In Kelly's case, the prosecutor on his own initiative nol prossed the charges without waiting for the deferral period to expire, evidencing the unwillingness of the Commonwealth to proceed. Upon entry of a nolle prosequi order, the prosecution terminated in a manner not unfavorable to the plaintiff. *Niese v. Klos,* 216 Va. 701, 222 S.E.2d 798 (1976). Nor is the Colorado procedure germane to the analysis here. The Colorado "entry of a deferred judgment following a guilty plea" requires an admission or acknowledgement of guilt. *Land v. Hill,* 644 P.2d at 45. At no time did Kelly ever admit factual guilt to the assault and battery charge, and no guilty plea was ever tendered.

While the Court itself was persuaded that the prosecution terminated in a manner not unfavorable to Kelly, because the parties crossed swords on the issue it became a question of fact for the jury. The jury's determination that Kelly won a favorable disposition is not contrary to the weight of the evidence and so must not be set aside.

■ The second basis for Garrick's j.n. o.v. motion is his contention that the "uncontradicted" evidence from Kelly's version of the facts as well as Kelly's admissions establish probable cause for the issuance of the assault and battery arrest warrant as a matter of law. He first points to Kelly's testimony that the artist avoided Garrick's initial roundhouse punch. Garrick argues that Kelly's response of punching him in the lip and placing him in a choke hold was therefore wholly excessive. Garrick also focuses on Kelly's agreement to plead guilty as an admission that he was the guilty party in the assault.

Virginia courts have been adamant in holding that "only where the facts relating to probable cause are not in dispute in a malicious prosecution action does the issue become a question of law for the court; and when such facts are in dispute, the issue is one of fact to be resolved by the triers of fact." *Lee v. Southland Corp.,* 219 Va. 23, 244 S.E.2d 756, 759 (1978) (quoting *Virginia R. & P. Co. v. Klaff,* 123 Va. 260, 266, 96 S.E. 244, 246 (1918)). The evidence concerning the events of October 6th was hotly contested. Each party accused the other of starting the fight. As noted above, the facts relating to Kelly's amenability to plead guilty were also disputed. The issue of probable cause was thus for the jury to resolve.

The jury could have reasonably concluded that Kelly's offer to plead guilty, conditioned on an opportunity to assert his factual innocence and on Garrick's facing trial if he declined to tender the same plea, did not entail an admission that he was actually guilty nor that Garrick had reason to believe him guilty. Moreover, Kelly's testimony that Garrick approached and assaulted him and that he acted only in self-defense deprives Garrick of the defense of probable cause as a matter of law.

The only way the jury could determine the probable cause issue posed by the parties' offsetting malicious prosecution claims was to determine which of them was telling the truth and which was the aggressor. The jury found Garrick unworthy of belief. Such issues of credibility are the essence of the jury's function.

Testing the jury's findings within the narrow confines of a motion for judgment notwithstanding the verdict, the Court concludes that the evidence is sufficient to defeat the motion.

### MOTION FOR A NEW TRIAL

Garrick moves for a new trial, pursuant to Rules 59(b) and 60(b)(2), Federal Rules of Civil Procedure, on a number of grounds. The Court finds none of them meritorious.

#### A. *Amount of Damages Awarded*

■ Garrick argues that he is entitled to a new trial on the malicious prosecution count because the verdict was grossly excessive and wholly unsupported by the evidence. The jury awarded $20,000 as compensatory damages for the assault and battery, and $5,000 as compensatory damages and $50,000 as punitive damages for the malicious prosecution.

"The general rule is that there is no fixed standard for the measurement of exemplary or punitive damages, and the amount of the award is largely within the discretion of the jury." *United Construction Workers v. Laburnum Construction Corporation,* 194 Va. 872, 75 S.E.2d 694, 709 (1953), *aff'd,* 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed.2d 1025 (1954). And unless the amount found is so great or small as to evince passion, prejudice, corruption or some mistaken view of law, the jury's verdict should not be set aside. *See Giant of Virginia, Inc. v. Pigg,* 207 Va. 679, 152 S.E.2d 271 (1967). There was no such evidence here. Each fact situation that merits an award of punitive damages is unique; therefore, the size of the award in one case cannot be compared to that in another case. Reference to verdicts in other cases is a dangerous game.

While the amount of punitive damages must be reasonable, its relationship to the amount of compensatory damages awarded is but one factor to be considered in the reasonableness determination. The punishment and deterrent functions of punitive damages must not be completely thwarted.

The real gravamen of a malicious prosecution tort is outrage at the malicious effort to have an innocent person convicted and jailed as a criminal. Distress and harm to reputation are the natural consequences of a malicious prosecution; actual damages flowing therefrom are to a great extent necessarily intangible, yet the tort gives great offense to the public sense of justice. The Fourth Circuit has observed that where actual damages are not readily quantifiable, "there is no necessary correlation between the amount of the punitive damages that may be assessed and the amount of the compensatory damages that the [prevailing party] may prove." *United States v. Snepp,* 595 F.2d 926, 937 (4th Cir.1979), *rev'd on other grounds,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980).

Noting that in his own malicious prosecution claim against Kelly Garrick prayed for punitive damages in the amount of $250,-000, the Court finds his pecksniffian protest of the excessiveness of the $50,000 awarded as exemplary damages against *him* meritless. Moreover, the record amply supports the jury's finding of actual malice necessary to support the punitive damages award.

#### B. *Jury Instructions*

■ Garrick argues that the jury instructions failed to adequately explain the difference between "legal malice" and "actual malice." Legal malice, relevant to the malicious prosecution, may be inferred from the want of probable cause. *Giant of Virginia, Inc. v. Pigg, supra.* The rule in Virginia is that, in suits for malicious prosecution, legal malice inferred from circumstances is sufficient to support an award of compensatory damages, but an award of punitive damages can be supported only by proof of actual malice. *F.B.C. Stores, Inc.*

v. Duncan, 214 Va. 246, 198 S.E.2d 595 (1973); Lee v. Southland Corporation, supra.

In the Court's charge on punitive damages, the jury was instructed that an act or failure to act is "maliciously" done if prompted or accompanied by ill will, or spite, or grudge, either toward the injured person individually, or toward all persons in one or more groups or categories of which the injured person is a member. This instruction adopted word for word the pertinent language of Instruction No. 8 offered by Garrick.

When the Court instructed on the elements of malicious prosecution, the jury was told that malice exists when the controlling motive for instigating criminal proceedings is any reason except a genuine desire to see justice done, to enforce the law, or to punish the guilty. Taken as a whole, the instructions sufficiently differentiated malice as a substantive element of malicious prosecution from malice as a predicate for punitive damages.

Garrick's objection that the jury was not expressly told that it could infer *legal* malice but could not infer *actual* malice from his lack of probable cause for having Kelly prosecuted is specious. Garrick made no secret of his ill will or grudge toward Kelly. He had originally demanded that the magistrate charge Kelly with attempted murder, and even told the jury that a five-year prison term for Kelly would be "generous." The jury did not have to look far for evidence of actual malice justifying an award of punitive damages.

The Court thus rejects Garrick's contention that the jury instructions were erroneous and merit a new trial.

### C. *Exclusion of Rule 404(b) Evidence*

■ Over Garrick's objection, the Court excluded evidence concerning an alleged unprovoked assault by Kelly on April 30, 1986 on the process server serving Garrick's complaint in this action. Garrick asserts the evidence was admissible to show "who was the likely aggressor on October 6, 1985" as well as "the continuing bias of Kelly toward Garrick."

Rule 404(b), Federal Rules of Evidence, specifically prohibits the use of "evidence of other ... wrongs to prove the character of a person in order to show that he acted in conformity therewith." This is precisely the reason Garrick wanted this evidence admitted—to show that Kelly is hot tempered and therefore probably started the October fight. The evidence was thus properly excluded under Rule 404(b).

Rule 403, Federal Rules of Evidence, also provided a proper basis for exclusion. The evidence would have been hotly contested and would have led to a foray into collateral issues, thereby distracting the jury's attention from the central issues in the case and wasting the Court's time.

The Court finds no basis for disturbing its prior ruling. Because the exclusion was proper, the Court denies Garrick's motion for a new trial on this ground.

### D. *Admission of Kelly's Exhibits*

■ Garrick claims that the Court's overruling his objections to Kelly's exhibits numbered 17a–f, 18a–b, and 19a–e amounts to prejudicial error. Having precluded an expert accountant from testifying about Kelly's damages, the Court admitted exhibits Kelly prepared to outline various prices he obtained from the sale of paintings. The records were authenticated by Kelly and were probative of the dimunition of Kelly's artistic production and earning capacity resulting from the injury he suffered when Garrick bit his hand during the fight. Thus, Garrick's authentication, relevance and hearsay objections were properly overruled.

Moreover, any possible error in admitting these exhibits was harmless: Garrick is unable to show prejudice. Kelly presented evidence that would have justified an award of approximately $400,000 as compensatory damages, yet the jury awarded him only $20,000 as compensatory damages on the assault and battery claim.

### E. *Sufficiency of the Evidence*

■ To respond to this challenge on the sufficiency of the evidence to support the

verdict, the Court notes that the testimony of the parties was in direct conflict on all the key issues in the case. Therefore, liability hinged on the jury's determination of which party was telling the truth. The jury believed Kelly.

Garrick further argues that the evidence of Kelly's injury was lacking since Kelly did not tell the treating physician whom he saw at the hospital immediately after the fight that he had been bitten. However, the expert medical testimony of a hand specialist proved otherwise, and the jury so found.

In deciding whether to grant a motion for a new trial, the trial court can and should make its own assessment of the credibility of the witnesses and the weight of the evidence. *Whalen v. Roanoke County Board of Supervisors*, 769 F.2d at 226; *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891–92 (4th Cir. 1980). The court should exercise its discretion to grant a new trial "whenever, in its judgment, this action is required in order to prevent injustice." 11 Wright & Miller, *Federal Practice and Procedure* § 2805 at 38 (1973). This includes ordering a new trial when the jury verdict is contrary to the weight of the evidence. *Whalen*, 769 F.2d at 226.

It was clear from the beginning of Garrick's testimony that, after he was bested in a not untypical fight over a woman, he was going to do anything he could—including instigating both criminal and civil prosecutions—to harass the victor. While he was at the police station immediately after the fight, Garrick announced that he was regaining his lawyerly wits. He demanded that the police photograph him in his beaten condition because he planned to bring a lawsuit against Kelly and his lawyer would just love the photographs. From that moment on, every statement Garrick made was completely self-serving: he told all who attended him a version of the events that he thought would fashion a good suit. The jury could have no other impression. Witnesses who seemingly had no interest in the outcome of the case flatly contradicted Garrick's wildly imaginative story. The Court found Garrick a most incredible witness, and the evidence in this case greatly preponderated in Kelly's favor. Indeed, had the jury decided the case any other way, it would have posed a serious problem for the Court not to grant a motion for judgment notwithstanding the verdict on Kelly's behalf.

### F. *Newly Discovered Evidence*

■ The standards for granting a new trial in the federal courts are clear and exacting. Where a party seeks a new trial on the basis on newly discovered evidence, he must show not only that the evidence is in fact newly discovered, but also that it is not cumulative or merely impeaching, *Smith v. Allen*, 212 F.Supp. 713, 714 (E.D. Va.1962), and that its presentation at trial would probably have changed the result. *See Jones v. United States*, 279 F.2d 433, 435–36 (4th Cir.), *cert. denied sub nom. Princeler v. United States*, 364 U.S. 893, 81 S.Ct. 226, 5 L.Ed.2d 190 (1960). *See also United States Fidelity & Guaranty Co. v. Lawrenson*, 334 F.2d 464, 465 (4th Cir.) *cert. denied*, 379 U.S. 869, 85 S.Ct. 141, 13 L.Ed.2d 71 (1964). He must also show that he was diligent in the investigation and presentation of his case. *Stiers v. Martin*, 277 F.2d 737 (4th Cir.1960).

Garrick's counsel has represented that he learned of an eye witness to the October 6th fight only after the jury rendered its verdict. However, a reading of the witness' statement reveals that his testimony is consistent with the verdict and would not have led to a different result at trial.

The witness makes no pretense that he could offer testimony on the key issue of which of the parties was the aggressor. In key respects, moreover, his statement directly contradicts Garrick's testimony and corroborates that of Kelly and other trial witnesses. It lends support to Garrick's version of the events only as to minor and collateral issues and to that extent is merely cumulative of testimony that Garrick himself put before the jury. Accordingly, Garrick's motion is insufficient to disturb the jury's verdict.

**616**

### MOTION FOR REMITTITUR

■ In the alternative to his motions for judgment notwithstanding the verdict and for a new trial, Garrick moves the Court for a remittitur. A remittitur is a discretionary procedure. However, if the verdict is supported by sufficient evidence and was reached in a fair and impartial trial, it should not be set aside merely on the ground that it appears to be large and more than the trial judge would have awarded if he had been a member of the jury. *Miller v. Vaughan Motor Co.*, 207 Va. 900, 153 S.E.2d 266 (1967). *See also Whalen v. Roanoke County Board of Supervisors, supra.* These parties received a fair and impartial trial, and the evidence amply supported the verdict. Accordingly, the Court declines to require a remittitur.

For these reasons, the Court denies the plaintiff's motions for judgment notwithstanding the verdict, for a new trial and for a remittitur. An appropriate order shall enter.