**Walter T. SNYDER, Plaintiff,**

v.

**CITY OF ALEXANDRIA, et al., Defendants.**

Civ. A. No. 94–528–A.

United States District Court, E.D. Virginia.

Nov. 30, 1994.

Elise R. Lapidus, Law Offices of George D. Varoutsos, Arlington, VA, for plaintiff.

Philip G. Sunderland, City Atty., George Andrews, Asst. City Atty., Alexandria, VA, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

Walter T. Snyder, convicted of rape and other charges by a Virginia jury, spent nearly seven years in prison before being pardoned as a result of DNA tests that indicated his innocence. Snyder believes his conviction was not merely a regrettable error, but resulted instead from police misconduct that violated his common-law and constitutional rights. Accordingly, he sues here, under a number of federal and state law theories, to recover damages from the City of Alexandria and three of the City's police officers. Treated here are the issues raised by defendants' threshold dismissal motion.

### I[1]

On October 28, 1985, the Police Department of the City of Alexandria assigned Detective Barry Shiftic to investigate a complaint of rape, sodomy, and burglary received that day. The victim described her assailant as a black male who wore red shorts, a grey hooded sweatshirt, and white tennis shoes. In the first of many conflicts between Snyder's and the police officers' versions of these events, Snyder alleges that the victim, at this time, also informed Shiftic that she could not see the man's face, because the room was too

---

1. For the purposes of this motion to dismiss, Snyder's factual allegations must be taken to be true. *See* Fed.R.Civ.P. 12(b)(6); *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976). Even so, the recitation of facts notes the principal discrepancies between Snyder's and defendants' versions of events.

dark. According to Snyder, Shiftic withheld this statement from Snyder's defense counsel.

After interviewing the victim, Shiftic canvassed the neighborhood to obtain information about the crime. He spoke to two neighbors who had seen Snyder, a black male who lived across the street from the victim, in his (Snyder's) front yard several hours prior to the rape. According to Snyder, the two witnesses reported to Shiftic that Snyder was not wearing a shirt at the time, and Shiftic unsuccessfully pressured the two witnesses to change their statements to fit more closely the victim's description of her assailant as wearing a grey hooded sweatshirt.[2] On November 8, 1985, Shiftic obtained a warrant to search Snyder's home, stating in the supporting affidavit that the witnesses had seen Snyder wearing a grey hooded sweatshirt, and that Snyder had admitted that he owned such a sweatshirt. Snyder denies that statement, and no such sweatshirt was ever found.

Also on November 8, Shiftic met with the victim and showed her photographs of several individuals. She tentatively selected Snyder's photo, although she noted she was not certain he was her assailant. Three days later, the victim observed Snyder washing his car in his driveway. At Snyder's trial, the victim testified that this observation was insignificant to her at the time, and that she did not report it to the police until after learning from the police that Snyder lived across the street from her house and was a suspect. In sharp contrast to the victim's testimony, Shiftic testified at trial that the victim called the police immediately after seeing Snyder washing his car, and that she had not previously been told Snyder's name, where he lived, or that he was a suspect.

On January 29, 1986, Snyder went to the Alexandria police station to retrieve clothing seized pursuant to the search warrant in November. Shiftic refused to return the clothing, indicating that it was evidence in an ongoing investigation. The next day, Snyder returned to the station seeking return of his

clothing. Shiftic asked Officer George Burnham to escort Snyder to the building's lobby, and wait there with him. Shiftic then telephoned the victim and asked her to come to the station where, upon arrival, she identified Snyder as her assailant in a "show-up," a face to face confrontation with the accused.

Shiftic, Burnham, and Officer Russell Peverall then questioned Snyder about the rape. Although Snyder alleges that he consistently maintained his innocence, the three police officers contend that Snyder confessed to committing the rape. After the officers arrested Snyder and handcuffed him to his chair in the interrogation room, Shiftic removed a number of hairs from Snyder's head. When Snyder blew the hairs off the table, Snyder claims Shiftic struck him in the face. At one point, Snyder attempted to leave the room, still handcuffed to the chair. Several officers restrained him and, in the process, Snyder suffered a broken nose and an injured shoulder. After Snyder was subdued, Shiftic pulled down Snyder's pants and removed a pubic hair. Snyder claims that the officers then moved him, with his pants at his ankles, to a public area of the police headquarters.

Snyder pled not guilty to charges of rape, cunnilingus, anal intercourse, aggravated sexual battery, and breaking and entering. Snyder raised several objections to the evidence presented against him, including (i) a motion to exclude evidence of his alleged confession of January 30, 1986, because he was not given *Miranda* warnings, (ii) a motion to suppress all evidence seized from his house pursuant to the November 1985 search warrant, on the ground that there was no probable cause for the warrant, (iii) a motion to suppress the victim's January 30, 1986 "show up" identification, on the ground that the procedure employed was unconstitutionally suggestive, and (iv) a motion to suppress the head and pubic hairs taken on January 30, 1986, as the results of an unreasonable seizure. The state trial court ruled against Snyder on each point.

---

**2.** The two witnesses would later testify at Snyder's trial in June 1986 that Snyder was not wearing a shirt when observed that evening.

On June 25, 1986, a jury in the Alexandria Circuit Court convicted Snyder on all charges,[3] and the court sentenced him to forty-five years in prison. Snyder appealed each of the trial court's evidentiary rulings to the Virginia Court of Appeals, but that court denied each of his contentions, upholding the conviction and the sentence. *Snyder v. Virginia*, No. 0300–87–4 (Va.Ct.App. June 5, 1990); *Snyder v. Virginia*, No. 0300–87–4 (Va.Ct.App. Dec. 15, 1989). The Supreme Court of Virginia refused Snyder's petition for appeal.

Snyder remained in prison for nearly seven years. In May 1992, state officials agreed to release evidence from Snyder's case for DNA testing. On October 28, 1992, a private laboratory in Boston returned test results indicating that Snyder did not commit the rape for which he was convicted. Additional testing confirmed that result. Thereafter, armed with these test results, the Commonwealth's Attorney joined Snyder's counsel in requesting a pardon from Virginia Governor L. Douglas Wilder. Governor Wilder granted Snyder an absolute pardon on April 23, 1993, explaining that, while he found no fault with the prosecution or the jury's verdict as rendered on the evidence available at the time, the DNA test results "place a cloud upon the verdict and raise a doubt concerning the ultimate issue of whether Walter Tyrone Snyder, Jr. is guilty of the crime for which he was convicted." [4] Snyder was released from prison on the day the Governor signed the pardon.

Subsequent to his release from prison, Snyder filed a complaint with the Alexandria Police Department concerning the conduct of the officers who investigated his case. In February 1994, the Chief of Police, Charles E. Samarra, informed Snyder that the department's "finding was that the actions of the officers involved in the investigation of your case from October 1985 through January 1986 were lawfully appropriate and within the guidelines established by Department policy."

In addition to filing the administrative complaint, Snyder petitioned the Alexandria Circuit Court to have his criminal record expunged. On January 11, 1994, the court granted the petition, noting that expungement was appropriate because:

> "Virginia Governor L. Douglas Wilder granted Petitioner's request for clemency on April 23, 1993; and ... the continued existence of said information relating to the arrest and conviction of said Petitioner causes or may cause circumstances which constitute manifest injustice of the Petitioner."

In September 1994, the City returned to the Alexandria Circuit Court with a motion to set aside Snyder's expungement order. This motion argued that the jurisdictional requirements for expungement were not met. Virginia law provides for expungement where the petitioner was acquitted, where nolle prosequi was taken or the charge otherwise

---

**3.** Case number F–8118, *Commonwealth of Virginia v. Walter T. Snyder,* was tried before Judge Alfred Swersky in the Alexandria Circuit Court on June 23, 24, and 25 in 1986.

**4.** The pardon further stated, in pertinent part, as follows:

> It has never been disputed that while the United States enjoys the best system of justice in use in the world today, it is not perfect and there are times when persons may be found guilty when in truth they are innocent. In this case, DNA evidence that has only recently come to light contradicts the strong case that was ably prosecuted by the Commonwealth's Attorney for the City of Alexandria and decided by a jury during the trial in June of 1986. Virginia was one of the first states to recognize the credibility of DNA utilization as a means to identify criminal perpetrators. If it can be

used to convict, it must also be used to protect the innocent.

> I have reviewed the case in detail, including the evidence that was presented at trial and certain evidence that was not. I can find no fault with the findings that were made by the jury based upon the evidence that was available to it at that time. However, the evidence that has been presented to me concerning the DNA tests that have been conducted only recently, place a cloud upon the verdict and raise a doubt concerning the ultimate issue of whether Walter Tyrone Snyder, Jr. is guilty of the crime for which he was convicted in 1986. It is very possible that had DNA been perfected as a forensic tool in 1986 and the jury had the advantage of the DNA analysis that has recently been accomplished, it would have reached a different verdict.

dismissed, or where the petitioner was "granted an absolute pardon for the commission of a crime for which he has been unjustly convicted." Va.Code § 19.2–392.2(A). The City argued that the Governor's pardon did not establish that Snyder was unjustly convicted, as the Governor expressly found no fault with the earlier criminal proceedings or the jury's verdict. The Circuit Court declined to set aside the expungement, finding that it met the jurisdictional requirements of § 19.2–392.2. The City is currently appealing this ruling to the Supreme Court of Virginia.

In April 1994, slightly less than one year after the issuance of his pardon, Snyder filed this action, against the City of Alexandria and Officers Shiftic, Burnham, and Peverall, alleging two constitutional tort claims and three state common-law claims. Specifically, Snyder's five claims may be summarized as follows:

- Count I alleges that the City and the three defendant officers violated Snyder's Fourth, Fifth, and Sixth Amendment rights, in violation of 42 U.S.C. § 1983.

- Count II asserts that the three officers conspired to misrepresent their January 30, 1986 conversation with Snyder as a confession, in violation of § 1983.

- Count III alleges common-law malicious prosecution against the three officers.

- Count IV alleges common-law battery against Shiftic.

- Count V asserts that the City is liable on the basis of respondeat superior for the common-law torts of its police officers.

Defendants' threshold attack on these claims rests on five grounds, namely (i) statutes of limitation, (ii) the absolute immunity of police officers' trial testimony, (iii) collateral estoppel, (iv) the sufficiency of the facts alleged to establish municipal § 1983 liability, and (v)

sovereign immunity. Each ground is separately addressed.

## II

Because Snyder is complaining about alleged police conduct occurring in 1985 and 1986, defendants argue that various statutes of limitation bar Snyder's claims. The relevant statutes of limitation are one year for common-law malicious prosecution [5], and two years for common-law battery [6] and § 1983 claims.[7] Thus, Snyder's claims are time barred if they accrued at the time he was accused, arrested, and convicted, between October 1985 and June 1986, or when his appeal ended unsuccessfully in the Virginia courts, in 1990. But his claims are not time barred if he can establish that the causes of action accrued later, at the time of his pardon in April 1993 or the judicial expungement in January 1994.

■ Snyder essentially concedes that certain of his claims are time barred. His claim for common-law battery (Count IV) clearly accrued at the time of the injury, the date of the alleged assault, and is therefore barred.[8] And, to the extent that Count V asserts that the City is vicariously liable for the alleged battery, it, too, is time barred. But Snyder's malicious prosecution claims in Counts III and V, and his § 1983 claims in Counts I and II, stand on a different footing. These claims, Snyder argues, are not time barred because they did not accrue until the issuance of the pardon or the entry of the expungement order. This argument raises a number of issues that merit close scrutiny.

## A

■ Favorable termination of the alleged malicious action is an essential element of a cause of action for malicious prosecution. In Virginia, a party asserting a malicious prosecution claim must establish that the allegedly malicious action has "terminated in

5. Va.Code § 8.01–248; *Federated Graphics Cos. v. Napotnik,* 424 F.Supp. 291 (E.D.Va.1976).

6. Va.Code § 8.01–243(A).

7. Va.Code § 8.01–243(A); *Blackmon v. Perez,* 791 F.Supp. 1086, 1090 (E.D.Va.1992).

8. *See Locke v. Johns–Manville Corp.,* 221 Va. 951, 275 S.E.2d 900, 904 (1981) (cause of action for

a manner not unfavorable" to him.[9] Not until this occurs does a claim for malicious prosecution accrue. Va.Code § 8.01–249(3). Snyder argues that a favorable termination of his criminal prosecution took place when he was pardoned, or alternatively, when his arrest and court records were expunged by court order. The validity of this argument turns on whether the nature and consequences of a pardon or an expungement order satisfy the purposes of the favorable termination requirement.

■ There are two reasons for the favorable termination requirement. First, the requirement eliminates the risk of conflict between two simultaneous judicial proceedings.[10] For example, an individual cannot bring a malicious prosecution action based on an ongoing criminal prosecution because the two proceedings might result in different outcomes on identical issues. If this were the only reason for the termination requirement, all pardons and expungements would qualify as favorable terminations. Once a pardon is granted or an expungement order is entered, the criminal prosecution will always be at an end, and there is therefore no risk of conflict between parallel criminal and civil proceedings.

But analysis does not end here, for the favorable termination requirement serves a second, related purpose of ensuring that challenges to the validity of criminal convictions are litigated in proceedings designed for that function, which proceedings include direct appeals and *habeas* petitions, but not civil damages actions. This aspect of the favorable termination requirement reflects the "hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments". *Heck v. Humphrey,* —— U.S. ——, ——, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994).[11] The question, therefore, is whether executive pardons or judicial expungement orders are also appropriate means by which a wrongly convicted person can establish his innocence. Answering this question requires an examination of Virginia law regarding pardons and expungements.

**B**

■ Virginia's constitution empowers the governor "to grant reprieves and pardon after conviction." Va. Const. art. V, § 12.[12] The constitution vests the governor with complete discretion over when to extend pardons, though it requires him to inform the General Assembly, at each regular session, of the "particulars of every case" in which a pardon is granted and the reasons for granting the pardon. *Id.*

■ In Virginia, there is no categorical rule as to the consequences or effect of a pardon. In certain instances, a pardon is given a specific and limited effect without regard to the reasons for, or terms of, the pardon.[13] In other circumstances, a pardon's

personal injury accrues when physical injury inflicted).

9. *See Garrick v. Kelly,* 649 F.Supp. 607, 610 (E.D.Va.1986), *aff'd by unpublished opinion,* 842 F.2d 1290, 1988 WL 21220 (4th Cir. Mar. 10, 1988); *Lee v. Southland Corp.,* 219 Va. 23, 244 S.E.2d 756, 758 (1978).

10. The concern here is "a matter of ripeness, a belief that the malicious prosecution action should not be tried at a time when it might tend to chill testimony in the criminal action, when issues may still be narrowed by the criminal process, and when the civil dispute might still be resolved by compromise or other non-judicial measures if the criminal trial can but proceed to an end." Prosser & Keeton, *Prosser and Keeton on the Law of Torts* § 119, at 874 (5th ed. 1984); *see also Heck v. Humphrey,* —— U.S. ——, ——, 114 S.Ct. 2364, 2371, 129 L.Ed.2d 383 (1994) (describing common-law rule's purpose of avoiding simultaneous litigations).

11. Consistent with this principle, the Restatement provides that, if the plaintiff alleging malicious prosecution has not established his innocence in the underlying proceeding, he "will not be permitted to prove that newly discovered evidence has shown his conviction to be unjust or even that the conviction was obtained by fraud or perjury." *Restatement (Second) of Torts* § 658 comment c (1977).

12. This authority is codified at Va.Code § 53.1–229.

13. For cases in which the Supreme Court of Virginia decided questions regarding pardons without reference to the reason for the pardon, see *Prichard v. Battle,* 178 Va. 455, 17 S.E.2d 393, 397 (1941) (finding pardon of motor vehicle offense does not restore driver's license revoked upon conviction); *Puryear v. Commonwealth,* 83 Va. 51, 58, 1 S.E. 512 (1887) (upholding jury's verdict in case where juror with felony convic-

effect is squarely a function of its terms and the reasons for its issuance.[14] The instant case falls into this latter category; for whether a pardon amounts to a favorable termination of a criminal proceeding depends on whether that pardon substantially impugns or discredits the conviction, which, in turn, is a function of the pardon's terms and the reasons for its issuance. A pardon that, by its terms and circumstances, substantially impugns or discredits a conviction, is a par-

don that satisfies the reasons for, and substance of, the favorable termination requirement.[15]

■ Of course, not all pardons fit this description. Some focus on a variety of matters unrelated to a person's innocence. For example, the governor may pardon a person because that person is deemed to have paid his societal debt and to be fully rehabilitated. Yet other pardons may be issued because of unusually sympathetic circumstances, or in-

tion had been pardoned); *Edwards v. Commonwealth*, 78 Va. 39, 44 (1883) (holding that pardon relieves the recipient, upon subsequent conviction of another crime, of the additional punishment provided by statute for a second offense); *Ball v. Commonwealth*, 35 Va. (8 Leigh) 726, 728 (1837) (finding pardon is inadequate substitute for new trial because pardon affects recipient's reputation and character more than acquittal); *Commonwealth v. Fugate*, 29 Va. (2 Leigh) 724, 726 (1830) (ruling that pardon does not restore public office forfeited upon conviction).

For Virginia statutory provisions that do not distinguish among pardons, see Va.Code § 18.2–308.2(b)(iii) (pardoned person may once again possess firearms); Va.Code § 24.2–231 (pardon does not restore public office forfeited on conviction); Va.Code § 57–57 (pardoned person may once again solicit charitable contributions).

14. In these circumstances, all pardons are not equal; their consequences and effects will depend on their terms and the reasons for their issuance. For example, a conditional pardon contains terms which govern its effect. *See Lee v. Murphy*, 63 Va. (22 Gratt.) 789 (1872) (determining that Virginia's governor may issue conditional pardon); *Wilborn v. Saunders*, 170 Va. 153, 195 S.E. 723 (1938) (finding governor may revoke conditional pardon after expiration of original sentence's term). Similarly, in *Anglea v. Commonwealth*, 51 Va. (10 Gratt) 696 (1853), the Supreme Court of Virginia held that the pardon there at issue did not relieve Anglea of the burden of paying the prosecution's costs. The court reached this conclusion, in part, by construing the pardon's language, and by examining the surrounding circumstances, particularly the fact that the pardon issued at Anglea's request, and not on the Governor's own initiative. *Id.* at 700.

Virginia also distinguishes among pardons by statute. For example, the reason for a pardon's issuance is relevant to the right to expungement. Virginia allows expungement of the arrest and court records of those who receive pardons if, as the Alexandria Circuit Court found in Snyder's case, the pardon is based on an "unjust conviction." Va.Code § 19.2–392.2(A).

Federal law also recognizes that all pardons are not equal. Under the Federal Rules of Evidence, a court must examine the reason for a pardon in order to determine whether a par-

doned conviction may be used to impeach a witness. Rule 609(c), Fed.R.Evid. Impeachment is not allowed where the pardon was based on a finding of rehabilitation, and the witness has not been convicted of a subsequent serious crime, or if the pardon was based on a finding of innocence. *Id.*

15. There is strikingly little precedent directly addressing this point, and none in Virginia. The Supreme Court of Virginia once approvingly quoted authority stating that a criminal prosecution is favorably terminated "where the accused has been discharged from bail or imprisonment." *Graves v. Scott*, 104 Va. 372, 51 S.E. 821, 823 (1905) (quoting "sections 248 and 249 of Bishop on Non-contract Law"). This language literally encompasses pardons, though the context strongly suggests that the court had only pre-conviction detention in mind.

Outside Virginia, the sole authority on point concludes that a pardon is not a favorable termination of a criminal prosecution. *See Turbessi v. Oliver Iron Mining Co.*, 250 Mich. 110, 229 N.W. 454 (1930). There, the court held that Turbessi could not maintain a malicious prosecution suit, even though he was pardoned after a remorseful witness admitted she perjured herself in incriminating him. *Turbessi* is not persuasive here for two reasons. First, the Michigan court concluded that Turbessi's conviction barred his civil suit by operation of *res judicata*. *Id.*, 229 N.W. at 455. This is clearly not the law in Virginia, where a criminal conviction has no preclusive effect on subsequent civil actions. *See Luke Construction Co. v. Simpkins*, 223 Va. 387, 291 S.E.2d 204 (1982). Second, *Turbessi* contains no convincing reason why a pardon can never constitute a favorable termination. The court was concerned that, if Turbessi's suit could proceed, then "every one convicted of a felony might, after serving a term of imprisonment, collaterally attack the judgment of the court convicting him," and "[t]here would be no end to litigation." *Turbessi*, 229 N.W. at 455. This "parade of horribles" is wholly illusory. Quite clearly, the court could have allowed a malicious prosecution action by Turbessi, one of the limited number of persons who receive pardons based on innocence, without allowing such suits by "every" convicted person.

deed even to relieve prison overcrowding.[16] In all of these instances, the guilt or innocence of the pardon's recipient is irrelevant to the reasons for the issuance of the pardon. And it is for this reason that recipients of pardons of this sort may not rely on such pardons to satisfy the favorable termination requirement. The opposite is true for pardons that impugn, displace, or discredit a judicial finding of guilt. These pardons, like not guilty verdicts, merits dismissals, and some decisions not to prosecute,[17] fully serve the purposes for which the favorable termination requirement exists.[18] And thus, these pardons, like not guilty verdicts, merits dismissals, and some decisions not to prosecute, can mark the favorable termination of a criminal prosecution for purposes of establishing a malicious prosecution cause of action. Were this not so, innocent persons maliciously prosecuted and convicted might have no tort remedy for the injury they suffer as a result of the malicious prosecution.

This principle, applied to the instant case, points persuasively to the conclusion that the pardon granted to Snyder qualifies as a favorable termination. Thus, the terms of the pardon reflect that Governor Wilder pardoned Snyder because the DNA evidence essentially exonerated him. In this regard, the Governor's pardon statement recognizes that "there are times when persons may be found guilty when in truth they are innocent," and that just as incriminating DNA evidence is used to convict, exculpatory test results "must also be used to protect the innocent." Further, the pardon reflects the Governor's conclusion that, although the jury's verdict may have been proper based on the evidence available in 1986, the DNA test results "place a cloud upon the verdict," "raise a doubt concerning" Snyder's guilt, and make it "very possible" that a jury with that evidence would have acquitted him.[19] By its terms, therefore, Snyder's pardon substantially impugns and discredits his conviction,[20] and therefore qualifies as a favorable termination of the prosecution against him.

**16.** *See* Kobil, *The Quality of Mercy Strained: Wresting the Pardoning Power from the King*, 69 Tcx.L.Rev. 569 (1991); Moore, *Pardon for Good and Sufficient Reasons*, 27 U.Rich.L.Rev. 281 (1993).

**17.** Virginia courts have held that a prosecutor's entry of *nolle prosequi* may favorably terminate a prosecution, enabling the accused later to sue for malicious prosecution. *Niese v. Klos*, 216 Va. 701, 222 S.E.2d 798 (1976). Yet, not every *nolle prosequi* order will support a subsequent action for malicious prosecution. A prosecutor's decision not to proceed does not necessarily mean that the prosecution was originally unjustified. This is so, for example, where the decision to abandon the prosecution results from "a voluntary compromise ... by the procurement or with the consent of the accused." *Orndorff v. Bond*, 185 Va. 497, 39 S.E.2d 352, 354 (1946); *Garrick v. Kelly*, 649 F.Supp. 607, 610–11 (E.D.Va.1986), *aff'd by unpublished opinion*, 842 F.2d 1290, 1988 WL 21220 (4th Cir. Mar. 10, 1988).

**18.** These purposes—avoiding conflict with an ongoing criminal prosecution and ensuring that challenges to convictions are determined in an appropriate forum—are surely met by this category of pardons. They are the result of a process that poses no threat of conflict with a prosecution because the process typically does not commence until after a prosecution ends. Nor is there any doubt that the pardon or clemency process is an appropriate forum for challenging the integrity of a conviction. Indeed, it is a process no less rigorous than a judicial appeal

and one that includes a thorough *de novo* review of the case by an impartial decision-maker. The Supreme Court recently affirmed that executive clemency decision-making is an appropriate and valuable mechanism for the reconsideration of criminal judgments in *Herrera v. Collins*, — U.S. ——, ——, 113 S.Ct. 853, 866–69, 122 L.Ed.2d 203 (1993). There, the Court found that the clemency power is "deeply rooted in our Anglo–American tradition of law, and is the historic remedy for preventing miscarriages of justice where judicial process has been exhausted." *Id.*, 113 S.Ct. at 866. Drawing on the views of Blackstone, Hamilton, and Justice John Marshall, the Court explained that the existence of this non-judicial, flexible remedy is essential to the maintenance of the rigor of the criminal justice system. *Id.*, 113 S.Ct. at 867. Finally, the Court noted that this "fail safe" mechanism works well in practice, for in those cases where the judicial system is believed to have erred, clemency has usually been extended. *Id.*, 113 S.Ct. at 868. Snyder's case illustrates that the Supreme Court's confidence in the pardon process is not misplaced.

**19.** For a more complete excerpt of the Governor's statement, see *supra* note 4.

**20.** Confirmation of this came during oral argument in this matter when counsel for defendants, in response to the Court's question, stated that the City now regards Snyder as innocent of the charges on which he had been convicted.

## C

■ In the alternative, Snyder claims that a favorable termination of his criminal case occurred when, in January 1994, he won judicial expungement of his conviction. While this claim might well succeed in other circumstances, it founders here because the expungement order has been appealed and is therefore not yet final.

In Virginia, a person charged with commission of a crime may seek to have the arrest and court records relating to the charge expunged provided (i) the person is acquitted, (ii) a nolle prosequi is taken or the charge is otherwise dismissed, or (iii) the person is "granted an absolute pardon for the commission of a crime for which he has been unjustly convicted." Va.Code § 19.2–392.2(A).[21] To obtain an expungement order, a person must file a petition with the circuit court in the city or county where the charge was brought. Once this occurs, the Commonwealth's Attorney is accorded an opportunity to object to the petition. Following a hearing, the circuit court will order expungement if it finds "that the continued existence and possible dissemination of information relating to the arrest of the petitioner causes or may cause circumstances which constitute a manifest injustice to the petitioner." Va.Code § 19.2–392.2(E).[22] Once an arrest or conviction has been expunged, the police and court records are sealed, and it is a misdemeanor violation to open or disclose them absent an order from the court which ordered the expungement. Va.Code § 19.2–392.3.[23] Employers, schools, and government agencies may not require a person to disclose information concerning expunged arrests and convictions. Va.Code § 19.2–392.4.

Snyder invoked this statutory expungement procedure by filing a petition and citing his pardon as a basis for expungement. Following a hearing,[24] an expungement order issued based on a judicial determination that Snyder was pardoned for "the commission of a crime for which he has been unjustly convicted." There can be little doubt that this expungement order, if final, would constitute a favorable termination of the prosecution of Snyder. The order, like the pardon, favorably ends, once and for all, the prosecution of Snyder. Importantly, the proceeding leading to the issuance of the expungement order created no risk of conflict with the original criminal prosecution, the former coming as it did well after the latter ended. Equally important is the fact that expungement order proceedings involve a judicial determination and are therefore quite clearly "appropriate vehicles for challenging the validity of outstanding criminal judgments." *Heck v. Humphrey*, —— U.S. ——, ——, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994). Thus, the expungement order, if final, would fully satisfy the reasons for the favorable termination requirement.

**21.** The Supreme Court of Virginia has held that "[t]he expungement statute applies to innocent persons, not to those who are guilty." *Gregg v. Commonwealth*, 227 Va. 504, 316 S.E.2d 741 (1984). When *Gregg* was decided, the expungement statute applied only when the prosecution ended by acquittal, nolle prosequi, or other dismissal, and not by pardon. In subsequently amending the statute in 1984 to include pardons, the legislature did not allow expungement of any pardoned offense, but rather provided for expungement only when the accused was unjustly convicted. Va.Code § 19.2–392.2(A). The amended statute, therefore, continues to limit expungement to those persons who never deserved conviction.

**22.** The Virginia legislature explained the importance of the expungement provision in its statutory statement of policy:

The General Assembly finds that arrest records can be a hindrance to an innocent citizen's ability to obtain employment, an education and to obtain credit. It further finds that the police and court records of those of its citizens who have been absolutely pardoned for crimes for which they have been unjustly convicted can also be a hindrance. This chapter is intended to protect such persons from the unwarranted damage which may occur as a result of being arrested and convicted.

Va.Code § 19.1–392.1.

**23.** The court may grant an ex parte order permitting review, but not copying, of the record if a law-enforcement agency establishes that the record is needed for a pending criminal investigation, or because the person with the expunged conviction has applied for employment with the agency. Va.Code § 19.2–392.3(B).

**24.** This hearing was quite brief, lasting approximately one minute, because the Commonwealth's Attorney joined Snyder's counsel in heartily endorsing Snyder's expungement petition.

As it happens, however, the order is not final; the City has appealed the order to the Supreme Court of Virginia, where the matter is pending. Because the order is not yet final, it cannot serve here to satisfy the favorable termination requirement, for it is settled in analogous circumstances that the pendency of an appeal of a lower court's criminal or civil judgment precludes a malicious prosecution based on that judgment.[25] In any event, Snyder's prosecution was favorably terminated when he received his pardon, and the resolution of the City's appeal concerning the expungement order is not determinative for Snyder's instant claims.

**D**

Defendants contend that no pardon or expungement order can ever constitute a favorable termination of a criminal prosecution. In support, they present three arguments worthy of consideration, but ultimately unpersuasive.

■ First, defendants argue that Snyder's pardon and his expungement order cannot favorably terminate his case because they are collateral proceedings, each separate and apart from the underlying criminal prosecution. Even assuming that pardons and expungement orders are collateral proceedings, it does not follow that they may not mark favorable terminations of prosecutions. Instead, the opposite is quite plainly the case, for it is beyond dispute that a *habeas* petition is a collateral proceeding,[26] and it is also beyond dispute that a successful *habeas* peti-

tion may constitute a favorable termination of an allegedly malicious prosecution. *Heck v. Humphrey,* —— U.S. ——, ——, 114 S.Ct. 2364, 2372, 129 L.Ed.2d 383 (1994); 52 *Am. Jur.2d Malicious Prosecution* § 33 (1987).[27] The collateral nature of pardons and expungement orders is irrelevant to whether these remedies may qualify as favorable terminations of a criminal prosecution.

■ Second, defendants contend that Snyder's pardon and his expungement order cannot favorably terminate his criminal proceeding because neither erases the fact that a conviction occurred. More specifically, defendants claim that, while a pardon relieves the convicted person of punishment, and an expungement order prevents disclosure of the conviction, neither "expunges" the conviction in the literal sense of destroying or obliterating the conviction.[28] This argument is neither persuasive nor entirely coherent. It is, to begin with, nonsensical to speak of "obliterating" or "destroying" a criminal conviction as one would literally destroy a tangible object. Nor does the Virginia favorable termination standard require such nonsense. Rather than demanding obliteration, the Virginia standard more sensibly requires only that the prosecution terminate in a manner not unfavorable to the malicious prosecution plaintiff. *See Lee v. Southland Corp.,* 219 Va. 23, 244 S.E.2d 756, 758 (1978); *Graves v. Scott,* 104 Va. 372, 51 S.E. 821, 822–23 (1905). Given this, it surely follows that a prosecution can end favorably to a defendant even if, as a matter of historical fact, it remains true

---

**25.** *See Williams v. Howe State Bank,* 702 S.W.2d 675, 676 (Tex.Ct.App.1985); *Moran v. Klatzke,* 140 Ariz. 489, 682 P.2d 1156, 1158 (Ct.App. 1984); *Stix & Co. v. First Missouri Bank & Trust Co. of Creve Coeur,* 564 S.W.2d 67, 70 (Mo.Ct. App.1978); *Johnston v. Byrd,* 279 Ala. 491, 187 So.2d 246, 249 (1966); *Albertson v. Raboff,* 46 Cal.2d 375, 295 P.2d 405, 410 (1956); *Breen v. Shatz,* 267 S.W.2d 942, 943 (Ken.Ct.App.1954); 52 *Am.Jur.2d* Malicious Prosecution § 44 (1987); *Restatement (Second) of Torts* § 674 comment j (1977) ("If an appeal is taken, the proceedings are not terminated until the final disposition of the appeal and of any further proceedings it may entail."). *But see Levering v. National Bank of Morrow County,* 87 Ohio St. 117, 100 N.E. 322 (1912) (appeal does not affect right to bring malicious prosecution action).

**26.** *See United States v. Hayman,* 342 U.S. 205, 222, 72 S.Ct. 263, 274, 96 L.Ed. 232 (1952).

**27.** Defendants point out that Virginia's circuit courts open a new file with a new file number for expungement petitions, rather than reviewing the petition as part of the original criminal file. The same procedure is followed by federal courts upon receiving *habeas* petitions.

**28.** To "expunge" means "[t]o destroy; blot out; obliterate; erase; efface designedly; strike out wholly. The act of physically destroying information—including criminal records—in files, computers, or other depositories." *Black's Law Dictionary* 522 (5th ed.1979).

that a conviction occurred.[29]

■■■■■ Third, defendants assert that allowing a pardon or an expungement to qualify as a favorable termination entails some sacrifice of the finality principle. This objection to the use of pardons and expungement orders as favorable terminations is mislabeled,[30] but still not wholly insubstantial. Because there are no time limits on granting pardons or issuing expungement orders, a favorable termination by one or the other could occur long after a prosecution has ended. In such circumstances, a party sued for malicious prosecution might well encounter difficulty in marshalling evidence for a defense owing to the passage of time. Yet, this objection is ultimately unpersuasive. To begin with, the objection, if accepted to bar the use of pardons and expungement orders as favorable terminations, would also, for the same reason, bar the use of *habeas* remedies for this purpose. The law is well-settled to the contrary. *See Heck,* —— U.S. at ——, 114 S.Ct. at 1372. Given this, a person potentially liable for malicious prosecution cannot be certain she will avoid liability until the person convicted exhausts appeals and is no longer eligible for *habeas* relief, that is, when the sentence of imprisonment, probation, parole, and all other forms of "custody," are completed.[31] Even then, it appears that the threat of a malicious prosecution suit does not entirely disappear, if post-custody judicial relief, such as a writ of error *coram nobis,* can serve as a favorable termination of the criminal action.[32] Allowing malicious prosecution actions to be based on pardons and expungements extends the uncertainty for potentially liable parties, but the incremental uncertainty is slight, given that *habeas* petitions and other judicial remedies may take many years to bear fruit.

Moreover, finality is but one of the competing interests at stake here. Virginia law recognizes the tort of malicious prosecution in order to provide recovery to persons injured by such prosecutions. The Supreme Court of Virginia has long recognized that "[i]t would be a reproach to our jurisprudence if such a prosecution could be inaugurated and carried forward maliciously and without probable cause, and the innocent victim have no remedy." *Spangler v. Booze,* 103 Va. 276, 49 S.E. 42, 43 (1904). It is clear

---

**29.** It is clear that a criminal proceeding may be favorably terminated even if, in some technical sense, the conviction remains, for a state prisoner victorious on federal *habeas* does not "obliterate" his conviction. When a federal court grants the 28 U.S.C. § 2254 petition of a state prisoner, "[w]hile the state court judgment is neither reversed nor vacated, the prisoner is released and the state court judgment authoritatively declared void." *Rimmer v. Fayetteville Police Department,* 567 F.2d 273, 277 (4th Cir.1977). Again, it is clear that *habeas* may favorably terminate a criminal proceeding. *See supra* note 27 and accompanying text.

**30.** It is important to note that allowing pardons or expungement orders to serve as favorable terminations has no bearing on the finality of the criminal proceedings. Rather, giving certain pardons or expungement orders this effect operates at most to extend the time during which a person may be exposed to liability for malicious prosecution.

**31.** *See* 28 U.S.C. §§ 2254, 2255; *Leonard v. Hammond,* 804 F.2d 838, 842 (4th Cir.1986) (recognizing that federal *habeas* statutes require petitioner to be "in custody" when petition filed). It is well settled that such "custody" is not limited to incarceration, but includes post-imprisonment supervision such as parole, probation, and certain rehabilitation programs. *See, e.g., Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 377, 9 L.Ed.2d 285 (1963) (parole); *Wright v. United States,* 732 F.2d 1048, 1050 (2d Cir.), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1984) (probation); *Dow v. Circuit Court of the First Circuit,* 995 F.2d 922, 923 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1051, 127 L.Ed.2d 372 (1993) (rehabilitation program).

**32.** A writ of *coram nobis* is available to correct errors "of the most fundamental character" occurring when a court's criminal judgment is based on an error of fact. *United States v. Morgan,* 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248 (1954). It is well established that the writ will lie where the convicted person is not in custody, either because he has completed his sentence or because he has not yet begun to serve it. *See id.* at 510, 74 S.Ct. at 252; *United States v. Hay,* 702 F.2d 572 (5th Cir.1983); 18 Am.Jur.2d Coram Nobis § 8 (1985). It is also clear that writs of *coram nobis* are available under Virginia law in some circumstances. *See Blowe v. Peyton,* 208 Va. 68, 155 S.E.2d 351, 356–57 (1967); *Dobie v. Commonwealth,* 198 Va. 762, 96 S.E.2d 747, 752 (1957); Va.Code § 8.01–677 (where judgment may be reversed, or error corrected, by writ of *coram nobis,* the same reversal or correction may also be obtained by motion).

that Virginia law does not prize finality above all else, especially where an unjust conviction has occurred, since Virginia's constitutional and statutory law do not limit the time within which pardons and expungements may be made.[33]

Finally, there is a certain unsettling illogic surrounding each of defendants' arguments, and their suggestion that Snyder has not obtained a favorable termination of the prosecution brought against him. In light of the DNA evidence, Snyder obtained an absolute pardon, release from prison, a judicial order establishing that he was unjustly convicted, and an assurance that his police and court records will not be disclosed in the future. It is hard to imagine what more Snyder could have done, or could do now. According to defendants, he could have declined the Governor's pardon, remained in prison, filed a *habeas* petition, waited to obtain a favorable ruling on the petition, if such a ruling was even possible,[34] and then pursued his malicious prosecution claims after his release based on the successful *habeas* petition. This is an unrealistic, if not absurd requirement, and one that Virginia law plainly does not impose. Rather, Virginia law requires only that Snyder establish a "not unfavorable termination" of his criminal prosecution, and Snyder has clearly done so. *See Lee v. Southland Corp.*, 219 Va. 23, 244 S.E.2d 756, 758 (1978). Snyder's action for malicious prosecution thus survives defendants' motion to dismiss.

## III

■ Snyder's § 1983 claims also survive the statutes of limitation, to a limited extent, if his pardon or expungement order constitutes an "invalidation" of his conviction. In *Heck v. Humphrey*, —— U.S. ——, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a § 1983 plaintiff must estab-

lish that his conviction has been invalidated before he may bring a § 1983 claim that, if proven true, would render his conviction invalid. *Id.*, 114 S.Ct. at 2372. In other words, a § 1983 claim cannot be used as a vehicle for invalidating a conviction. Rather, invalidation of the conviction by some other means is a precondition to maintaining any § 1983 claim that necessarily implies the invalidity of the conviction. *Id.* A cause of action for such § 1983 claims does not accrue until the invalidation occurs. *Id.*, 114 S.Ct. at 2374.

■ Snyder's § 1983 claims fall into two categories. Certain of his claims, if proven true, would *not* render Snyder's conviction invalid. These are now time barred, for they accrued at the time of the alleged police misconduct on which the claims are based, namely in 1985 or 1986. Specifically, Snyder cannot base his § 1983 claims on allegations that the police used excessive force on him, conducted an unlawful search of his home, or made an unlawful seizure of his hair.

■ Snyder's second category of claims consists of those that necessarily imply the invalidity of his conviction. Specifically, this category consists of allegations that police withheld exculpatory evidence, improperly swayed the victim's identification of Snyder as her assailant, and knowingly misrepresented Snyder's statements as a confession. Snyder may not assert these claims unless he can show that his conviction was invalidated and that he commenced his § 1983 action within the limitations period that began on the date of that invalidation. Thus, the question presented with respect to these claims is whether Snyder's conviction was invalidated by his pardon or the expungement order. If so, then these claims are timely raised and survive this threshold attack.

The answer to the question whether pardons and expungement orders can invalidate

---

33. *See* Va. Const. art. V, § 12; Va.Code § 19.2–392.2.

34. Snyder might not be able to obtain *habeas* relief solely by claiming that newly discovered evidence, such as the DNA test results, proved his innocence, unless he could also establish "an independent constitutional violation occurring in the underlying state criminal proceeding." *Herr-*

*era v. Collins*, —— U.S. ——, ——, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993). In *Herrera*, the majority of the Court held that a claim of actual innocence, with no allegation of a separate constitutional violation, would give rise to *habeas* relief, if at all, only where an "extraordinarily high" threshold demonstration of "truly persuasive" evidence was made. *Id.*, 113 S.Ct. at 869.

a conviction for § 1983 purposes is found in *Heck*. There, the Supreme Court derived the § 1983 "invalidation" requirement from the favorable termination requirement of common-law malicious prosecution. *See Heck*, 114 S.Ct. at 2371. The two requirements are analogous and serve the same purposes. *Id.*, 114 S.Ct. at 2371–72. Thus, the analysis of pardons and expungement orders in Part II of this opinion, concluding that the pardon favorably terminated the prosecution of Snyder,[35] is directly applicable here. Just as certain pardons or expungement orders can favorably terminate a criminal prosecution, so, too, can they invalidate a conviction for § 1983 purposes, as *Heck* requires.

Language in the *Heck* opinion furnishes further support for this conclusion by noting that a § 1983 plaintiff can meet the invalidation requirement by showing that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 114 S.Ct. at 2372. Though executive pardons and judicial expungement orders are not specifically listed, they certainly seem to be within the reach of the Court's language, which does mention "expungement by executive order." Such a remedy does not exist in Virginia.[36] The strongest executive relief that a Virginia prisoner can obtain is an absolute pardon based on possible innocence, such as that received by Snyder. There is no reason in principle or policy for the Supreme Court, for

these purposes, to distinguish between prisoners in states where executive expungement orders are available, and prisoners in states, like Virginia, that do not recognize such a remedy. Thus, Snyder's pardon appears to fall within *Heck*'s description of the ways in which a conviction can be invalidated.[37]

In argument against these conclusions, defendants make much of the interplay between a footnote in *Heck*'s majority opinion, 114 S.Ct. at 2374 n. 10, and a section of Justice Souter's opinion concurring in the judgment, *id.*, 114 S.Ct. at 2379–80. Contrary to defendants' view, these passages do not suggest that Snyder's pardon and expungement order cannot fulfill the invalidation requirement. Indeed, they imply the opposite.

In his concurrence, Justice Souter agrees with the majority's view that state prisoners should be required to demonstrate the invalidity of their convictions, by *habeas* or other means, prior to instituting § 1983 damages actions for unlawful conviction or confinement. But in contrast to the majority, Justice Souter would not require such an invalidation to be demonstrated by an individual "outside the intersection of § 1983 and the habeas statute," such as a person who completed his sentence, was released from prison, and subsequently discovered his conviction was constitutionally defective. *Id.*, 114 S.Ct. at 2379. If unable to raise a § 1983 claim, such a person would have no federal remedy, for federal *habeas* jurisdiction extends to state prisoners only if still "in custody." 28 U.S.C. § 2254(a); *see supra* note 31. At the same time, Justice Souter plainly rec-

---

**35.** The expungement order, if it is affirmed on appeal and becomes final, would also constitute a favorable termination.

**36.** *See* 1984–1985 *Va. Rep. Att'y Gen.* 143, 1984 WL 184499 (opining that Virginia's governor has no power to order expungement of conviction record as provision of an absolute pardon).

**37.** Alternatively, Snyder's expungement order, if finally upheld after appeal, invalidated his conviction within *Heck*'s meaning. It is unlikely that the Court meant to allow an executive expungement order to invalidate a conviction, and not a judicial expungement order. A judicial expungement is perhaps better suited to satisfy this requirement. As defendants have repeatedly

noted, executive pardons and expungements are political actions which may be made for various reasons unrelated to whether the convicted person committed the crime or received a fair and proper trial. Judicial expungements, as illustrated by Virginia's statute, Va.Code § 19.2–292.2, are confined to those situations where the conviction was unjust.

In addition, in the same sentence that mentions executive expungements, *Heck* refers to convictions "declared invalid by a state tribunal authorized to make such determination." 114 S.Ct. at 2372. This is essentially what happened to Snyder when the Circuit Court expunged his record after determining that he had been unjustly convicted and fully pardoned. Va.Code § 19.2–392.2(A)(3), (E).

ognizes that the released prisoner, although no longer in custody, could seek to have his conviction invalidated by a "favorable state ruling," clearing the way for his § 1983 claims to proceed. 114 S.Ct. at 2379.[38] What troubled Justice Souter is that the released prisoner might not be able "to convince the state courts that his conviction was unlawful." *Id.*, 114 S.Ct. at 2380. Justice Souter therefore does not suggest that a prisoner who completes his sentence and is released from state prison can *never* thereafter pursue § 1983 claims. He merely points out that the released prisoner would have no "federal forum for claiming a deprivation of federal rights," and would have to avail himself of some state law mechanism. *Id.*, 114 S.Ct. at 2379.[39]

The majority responds to Justice Souter by noting that the invalidation requirement is "not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Id.*, 114 S.Ct. at 2374 n. 10. In other words, the majority is willing to accept the possibility that § 1983 would be unavailable to a former state prisoner, no longer in custody, who is unable to secure a determination, via state law procedure, that his conviction was unlawful. The majority admits that § 1983 will not provide a remedy in all cases. *Id.* Thus, in responding to Justice Souter,

the majority simply made clear that a released prisoner must demonstrate, by some appropriate means, that his conviction has been invalidated prior to the institution of his § 1983 damages action. In so doing, however, the majority in no way suggested that invalidation cannot occur by a pardon or expungement order.[40]

Because Snyder's conviction has been invalidated as required by *Heck*, certain of his § 1983 claims survive the statutes of limitation. In determining which claims enjoy deferred accrual under *Heck*, the relevant test is "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.*, 114 S.Ct. at 2372. A number of Snyder's allegations, if proven true, do not ultimately relate to his conviction's validity, and therefore cannot serve as the basis for his § 1983 claims. Snyder's allegations that the police used excessive force and unnecessarily exposed him in a public area of the police headquarters on January 30, 1986, are unrelated to the validity of his conviction. Police liability for such conduct bears no relation to Snyder's guilt or innocence. In addition, Snyder cannot base his § 1983 claims on the November 8, 1985 search of his home or the January 30, 1986 seizure of his hair. The Supreme Court

**38.** Although, as Justice Souter recognized, there are no federal judicial remedies for a person wrongly convicted in state court who is no longer in custody, there are such remedies in state law. A writ of *coram nobis* is one example of the state-law judicial processes by which a convicted person may challenge his conviction or sentence after being released from custody. *See supra* note 32; *Lowery v. McCaughtry*, 954 F.2d 422, 423 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (holding that federal court may not issue writ of *coram nobis* for state prisoner); *Theriault v. Mississippi*, 390 F.2d 657 (5th Cir.1968) (same). Defendants misconstrue *Heck* by disregarding the existence of such post-custody state-law remedies.

**39.** Justice Souter offers the example of a former slave, framed and convicted for the rape of a white woman in a state dominated by the Ku Klux Klan, who cannot prove his conviction was unconstitutional until after his release. This example emphasizes that the problem is not that the released prisoner can never obtain § 1983 relief, but that he cannot do so solely through federal courts. Despite the prisoner's release,

Justice Souter acknowledges that the state courts could still determine that the conviction was invalid. —— U.S. at —— — ——, 114 S.Ct. at 2379–80. Justice Souter's concern is that, where the state courts' doors are effectively closed to the former prisoner because of racial prejudice or another reason, the former prisoner has no uniquely federal remedy, a result Justice Souter finds to be at odds with the purposes of § 1983. *Id.*, 114 S.Ct. at 2380.

**40.** The defendants also argue, incorrectly, that a footnote in Justice Souter's concurrence establishes that federal *habeas* is the only way Snyder could have obtained an invalidation of his conviction. Justice Souter, in the footnote, describes the majority's holding as a rule that a state prisoner who is unsuccessful in state court and on federal *habeas* cannot proceed on § 1983 damages claims. 114 S.Ct. at 2379 n. 4. Justice Souter clearly meant only to paraphrase the majority's holding, and his paraphrase is necessarily incomplete given that the majority explicitly mentioned other means of invalidation, including "expungement by executive order." *Id.*, 114 S.Ct. at 2372.

stated in *Heck* that a § 1983 claim based on an allegedly unreasonable search and seizure "would not *necessarily* imply that the plaintiff's conviction was unlawful," even if the evidence taken was used at trial. *Id.*, 114 S.Ct. at 2372 n. 7. The conviction might still be valid, despite the unlawful search, as a result of doctrines such as independent source, inevitable discovery, and harmless error. *Id.* For these allegations, Snyder possessed a § 1983 cause of action as soon as the events took place. Accrual was not deferred until the invalidation of Snyder's conviction, and therefore § 1983 claims based on these allegations are now time barred.

The remainder of Snyder's allegations meet the *Heck* standard. Snyder's § 1983 claims necessarily imply that his conviction was invalid to the extent they are based on allegations that the police withheld evidence,[41] orchestrated a mistaken identification by the victim,[42] and fabricated a confession.[43] These claims are not time barred.

## IV

 Snyder's § 1983 claims are limited in one additional respect. Snyder may not recover damages under § 1983 for the testimony offered by police at his June 1986 criminal trial. Section 1983 does not provide

a remedy for such testimony, even if clearly perjured. The Supreme Court has held that testifying police share the absolute immunity enjoyed at common law by prosecutors, judges, and witnesses, an immunity not abrogated by the enactment of § 1983. *See Briscoe v. LaHue*, 460 U.S. 325, 335–41, 103 S.Ct. 1108, 1115–19, 75 L.Ed.2d 96 (1983). This immunity is limited to the police officer's testimony at trial. An officer who has violated an accused's rights, through conduct outside the courtroom, does not absolve himself of § 1983 liability by testifying about the charged conduct.[44]

For example, Snyder may recover § 1983 damages if he proves, as alleged, that the police disclosed information about Snyder to the victim in order to ensure she would identify him as her assailant. But he may not pursue § 1983 claims charging that the police later testified falsely concerning their communications with the victim in order to conceal this fact. Similarly, Snyder may recover damages if he proves, as alleged, that the police knowingly fabricated a confession by him and then used the purported confession to justify his arrest. But Snyder may not base § 1983 claims on the officer's testimony regarding the confession. Finally, although Snyder may recover under § 1983 if he proves, as alleged, that the police withheld

**41.** For decisions applying *Heck* to allegations that exculpatory evidence was withheld, see *Hooper v. Anderson*, 37 F.3d 1505, No. 93–35422, 1994 WL 551549, at *1 (9th Cir. Oct. 6, 1994); *Olsen v. Correiro*, No. 92–10961–PBS, 1994 WL 548111, at *2–4 (D.Mass. Sept. 26, 1994); *Frost v. Fox*, No. C–94–0621, 1994 WL 412440, at *2–4 (Aug. 3, 1994); *Hudson v. Chicago Police Department*, 860 F.Supp. 521, 523 (N.D.Ill.1994); *Girdler v. Dale*, 859 F.Supp. 1279, 1282 (D.Ariz. 1994).

· The *Heck* case itself indicates that certain of Snyder's allegations, namely that the police withheld evidence and unfairly swayed the victim's identification, relate to his conviction's validity. *Heck's* § 1983 complaint alleged that prosecutors and police knowingly destroyed exculpatory evidence, and used an unlawful voice identification procedure at petitioner's trial. *Heck*, —— U.S. at ——, 114 S.Ct. at 2368. Both lower courts found that these allegations challenged the legality of *Heck's* conviction, and since *Heck's* conviction had never been invalidated, the Supreme Court accordingly dismissed *Heck's* entire § 1983 action. *Id.*, 114 S.Ct. at 2374.

**42.** For decisions applying *Heck* to allegations that police utilized unconstitutional identification procedures, see *Williams v. Hutchens*, 870 F.Supp. 857, 863 (N.D.Ill.1994); *Woodard v. Gillespie*, No. 94–3547, 1994 WL 561916, at *3 (E.D.Penn. Oct. 14, 1994); *Rodriguez v. Craig*, No. 91–10665–RWZ, 1994 WL 561999, at *2–4 (D.Mass. Aug. 18, 1994).

**43.** For decisions applying *Heck* to allegations that confessions were obtained by coercion, see *Hooper v. Anderson*, 37 F.3d 1505, No. 93–35422, 1994 WL 551549, at *1 (9th Cir. Oct. 6, 1994); *Williams v. Hutchens*, No. 93–C–923, 1994 WL 603776, at *6 n. 5 (N.D.Ill. Nov. 2, 1994).

**44.** The Supreme Court made clear in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), that *Briscoe's* absolute immunity is limited to functions "intimately associated with the *judicial* phase of the criminal process." *Id.* at 342, 106 S.Ct. at 1097 (police who obtained search warrant without probable cause entitled only to qualified immunity).

exculpatory evidence,[45] he may not charge the police officers with failing to reveal the withheld information in trial testimony. In sum, although Snyder is entitled to pursue § 1983 claims that challenge the validity of his conviction, he may not base those claims on testimony offered by defendants at his trial.

**V**

█ Defendants contend that Snyder is collaterally estopped from relitigating various rulings made by Virginia courts in the course of the state criminal proceeding against him. Specifically, defendants contend that Snyder is bound by the pre-trial rulings, affirmed by the Virginia Court of Appeals, determining that (i) Snyder was not in custody at the time of the alleged confession of January 30, 1986, and therefore *Miranda* notice was not required, (ii) the November 1985 warrant for the search of Snyder's house was supported by an affidavit reciting facts which, if true, were sufficient to constitute probable cause, (iii) the "show-up" procedure by which the victim identified Snyder on January 30, 1986, was not unconstitutionally suggestive, and (iv) the seizure of Snyder's head and pubic hairs on January 30, 1986 was not unreasonable within the Fourth Amendment's meaning. Only rulings (i) and (iii) are in issue with respect to collateral estoppel, because § 1983 claims based on the search involved in ruling (ii) and the seizures involved in ruling (iv) are time barred by virtue of the application of *Heck*. *See supra* Part III. Despite defendants' contentions, collateral estoppel is not applicable to Snyder's present claims for several reasons.[46]

█ First, Snyder is not attempting to relitigate issues decided against him in the Virginia courts. Collateral estoppel applies, of course, only when an issue was actually and necessarily decided by a prior court. *See Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917, 921 (1974).[47] Snyder's present action does not attempt to reopen questions previously answered. For example, Snyder unsuccessfully argued, by pre-trial motion and on direct appeal, that his alleged confession should be suppressed because he did not receive *Miranda* warnings. He did not argue, and so the Virginia courts did not consider, the claim he now presents, namely, that there was no confession. Similarly, the Virginia courts ruled that the police officers' use of a "show-up" identification procedure, rather than a line-up, was not unduly suggestive and did not create an unconstitutional likelihood of misidentification. This is not the claim Snyder now presents in his § 1983 action. Instead, the claim Snyder now presents is that other police misconduct tainted the victim's identification, a claim that was neither litigated nor decided in the original proceedings. Collateral estoppel therefore cannot operate to preclude Snyder's present claims.

█ Second, if, as Snyder alleges, the police withheld exculpatory evidence concerning the victim's identification and the alleged confession, then it follows that Snyder did not have a full and fair opportunity to litigate these issues in the Virginia proceedings. Virginia generally applies the doctrine of mutuality, requiring that the party asserting collateral estoppel must have been a party or privy to the prior action, such that it would have been bound had the earlier litigation reached the opposite result. *Norfolk & Western Railway Co. v. Bailey Lumber Co.*,

---

**45.** This conduct, if it occurred, would constitute a violation of Snyder's constitutional rights. *See Goodwin v. Metts*, 885 F.2d 157, 163 (4th Cir. 1989) ("Being subjected to a prosecution because an officer withheld exculpatory evidence from the prosecutor while urging that the prosecution should go forward can work a constitutional deprivation."), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1812, 108 L.Ed.2d 942 (1990).

**46.** Even if issue preclusion were imposed here, it of course would not prevent Snyder from relying on evidence relevant to the earlier rulings to prove a fact other than those conclusively re-

solved in the prior proceedings. *See Simon v. Commonwealth*, 220 Va. 412, 258 S.E.2d 567, 572 (1979); *Dorn v. Commonwealth*, 3 Va.App. 110, 348 S.E.2d 412, 415 (1986).

**47.** Virginia law controls here because, in § 1983 proceedings, a prior judgment has the same preclusive effect it would have in the courts of the state that issued the judgment. 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980) (holding that collateral estoppel applies to § 1983 claims).

221 Va. 638, 272 S.E.2d 217, 219 (1980). The mutuality requirement insures that a litigant previously had "a full and fair day in court" on the estopped issue. *Bates v. Devers*, 202 S.E.2d at 921 n. 7. Where, as here, there is no mutuality,[48] the Virginia courts have suggested that non-mutual defensive preclusion might be permissible when it is *"compellingly clear"* that the estopped party had a full and fair opportunity to litigate the issue. *Id.* In the circumstances, namely the allegation that police withheld exculpatory evidence, it is anything but compellingly clear that Snyder had a full and fair opportunity to litigate the issues.

■■■■ Third, it is, moreover, unclear whether Virginia courts, in a civil action, would apply collateral estoppel with respect to issues decided in prior criminal proceedings, even if there was a full and fair opportunity to litigate. It is well settled in Virginia that a criminal judgment of conviction has no preclusive effect on subsequent civil actions. *See Luke Construction Co. v. Simpkins*, 223 Va. 387, 291 S.E.2d 204 (1982). The parties, purposes, and standards of proof in criminal and civil proceedings are too different. The Supreme Court discussed Virginia's law on this point in *Haring v. Prosise*, 462 U.S. 306, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983). Prosise pled guilty to phencyclidine manufacture, but later brought a § 1983 damages action based on an unlawful search of his apartment. The Court held that Prosise was not precluded by his plea from challenging the legality of the search, because that issue was neither actually litigated nor necessarily decided. *Id.* at 314–16, 103 S.Ct. at 2373–75. In footnote, the Court discussed the Fourth Circuit court's alternative reason for denying preclusion, that being Virginia's rule against giving preclusive effect to criminal judgments. *Id.* at 316 n. 10, 103 S.Ct. at 2374 n. 10. After discussing the possibility that Virginia courts might relax this rule in some instances, the Court found that "the court below reasonably concluded that, under Virginia law, a criminal conviction would not be given preclusive effect in a

§ 1983 action with respect to any issues, including issues that were actually and necessarily decided." *Id.*

■■■■ Here, defendants contend that in the circumstances presented by Snyder's case, Virginia courts would relax the non-preclusion rule. Some support for this contention can be derived from *Lee v. Winston*, 717 F.2d 888 (4th Cir.1983), where the Fourth Circuit, faced with a situation similar to the instant case, acknowledged the uncertainty of Virginia law on this point. *Id.* at 894–95. The *Lee* court suggested that Virginia courts might relax the non-preclusion rule when (i) the doctrine of collateral estoppel is invoked defensively, (ii) the determination to be given preclusive effect is a pretrial ruling, rather than a judgment of acquittal or conviction, and (iii) the civil defendants are sufficiently in privity with the Commonwealth to reduce the lack of mutuality that otherwise would exist. 717 F.2d at 895. Although these elements were present in *Lee*, as here, the court was "hesitant to rest decision here on any conclusion that Virginia would or would not ordinarily give collateral estoppel effect," and chose instead to conclude that Lee did not have the requisite full and fair opportunity to litigate the issues in the earlier proceeding. *Id.* at 895. The same circumspection that stayed the hand of the Fourth Circuit in *Lee* militates against imposing preclusion here.

In sum, for each of several reasons, Snyder is not bound by the earlier adverse pretrial and appellate rulings against him.

## VI

■■■■ Defendants also attack the sufficiency of Snyder's allegations of § 1983 municipal liability. Snyder asserts, in Count I of his complaint, that the City is liable under § 1983 for (i) inadequately training its police officers "with respect to investigation, identification and interrogation procedures," and (ii) maintaining "established Department policies and customs" which necessarily entail violation of accused persons' constitutional rights. Snyder contends that the City's failure to train constitutes "deliberate indiffer-

---

**48.** Defendants were not parties to Snyder's Virginia criminal proceedings and are not bound by

determinations made in Snyder's favor.

ence," as is required for recovery of damages on such a claim. *City of Oklahoma v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). To date, Snyder has not offered specific allegations regarding the inadequacies of the City's training that begin to amount to "deliberate indifference" to constitutional rights on the City's part. Nor has Snyder specified what improper policies and customs were maintained by the City's police. Yet, at this point, dismissal of these claims would be inappropriate in view of the Supreme Court's decision in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* — U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). There, the Court unanimously rejected the idea that there is any "heightened pleading standard" applicable to § 1983 actions alleging municipal liability. The Court held that a plaintiff need only plead "a short and plain statement of the claim," and that "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Id.,* 113 S.Ct. at 1163. Snyder has therefore sufficiently pled the City's liability on this theory to survive the threshold motion to dismiss.

## VII

 The last issue raised by defendants' motion to dismiss is sovereign immunity. Snyder claims, in Count V, that the City is vicariously liable for the common-law torts of its police officers.[49] This Count, to the extent it asserts vicarious liability for the alleged battery, is time barred.[50] To the extent Count V claims vicarious liability for malicious prosecution, it is barred by sovereign immunity. By statute, Virginia has retained its immunity from "[a]ny claim arising out of the institution or prosecution of any judicial or administrative proceeding, even if without probable cause." Va.Code § 8.01–195.3(6). Under Virginia law, a municipality is treated as an agency of the state, and

therefore shares the same immunity, when it acts in its governmental, rather than proprietary, capacity. *Bryant v. Mullins,* 347 F.Supp. 1282, 1284 (W.D.Va.1972); *Hoggard v. City of Richmond,* 172 Va. 145, 200 S.E. 610, 611 (1939); *Franklin v. Town of Richlands,* 161 Va. 156, 170 S.E. 718, 719–20 (1933). As these cases indicate, the City acted in its governmental character in maintaining and operating a police force, and therefore is immune from liability for the wrongful acts of its officers.

## VIII

In sum, certain of Snyder's claims survive defendants' motion to dismiss and certain of his claims do not. Specifically, this opinion concludes that:

(1) A pardon constitutes the favorable termination of a criminal prosecution, so as to permit the convicted person to recover for common-law malicious prosecution, when the pardon is granted because of uncertainty about the person's guilt and it substantially impugns or discredits the conviction. Because Snyder's pardon meets this standard, his cause of action against the three individual defendants for malicious prosecution (Count III) accrued on the date of the pardon, and is therefore timely.[51]

(2) Such a pardon also invalidates a conviction, within the Supreme Court's meaning in *Heck,* allowing the pardon's recipient to recover on § 1983 claims that, if proven true, would render the conviction invalid. Snyder's § 1983 claims (Counts I and II) that challenge his conviction's validity accrued on the date of the pardon, and are timely raised, while his § 1983 claims that do not necessarily imply his conviction's invalidity are time barred.

(3) Snyder's claim of common-law battery by defendant Shiftic (Count III), as well as his claim that the City is vicariously liable for the alleged battery (Count V), accrued on the date of the battery, and are time barred.

---

**49.** The City of course cannot be held vicariously liable under § 1983 on a theory of *respondeat superior. See Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

**50.** *See supra* note 8 and accompanying text.

**51.** Because Snyder's expungement order is not final, it has no bearing on these conclusions.

(4) Snyder may not recover damages for defendants' testimony at his criminal trial, for police officers enjoy absolute immunity for trial testimony.

(5) Collateral estoppel is not applicable to Snyder's surviving claims.

(6) Snyder's pleadings at this threshold stage sufficiently state a cause of action for municipal § 1983 liability (Count I).

(7) Snyder's claim that the City is vicariously liable for malicious prosecution (Count V), is barred by sovereign immunity.

An appropriate order will issue.